IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARK GOMEZ, | ) |
|       Plaintiff, | ) |
| | ) No. 1:20-cv-02488 |
| v. | ) |
| | ) Judge Mary M. Rowland |
| CSL PLASMA, INC., | ) |
|       Defendant. | ) |

**PLAINTIFF MARK GOMEZ'S MEMORANDUM OF LAW
IN SUPPORT OF PARTIAL SUMMARY JUDGMENT**

Several cases have been filed around the country against facilities such as defendant CSL Plasma: plasma banks that pay members of the public a fee for donating blood. A threshold issue in these cases has been whether a plasma bank is a "public accommodation" under Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181(7). CSL Plasma lost this issue in *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171 (3d Cir. 2019), but won it in *Silguero v. CSL Plasma, Inc.*, 907 F.3d 323 (5th Cir. 2018). The plaintiff also won the issue in *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016). Because it is possible to resolve the issue as a matter of law, plaintiff moves for partial summary judgment on this coverage issue.

As the argument below establishes, in all relevant respects CSL Plasma holds itself out as an establishment that is open to the public. In a filing in another federal case in this district last year, a case under the Illinois Biometric Information Privacy Act (BIPA), 740 ILCS 14/1, *et seq.*, CSL Plasma contended that it is "health care setting" that "evaluate[s] plasma donors for eligibility to donate (as mandated by the FDA), which is based on an assessment of medical history, evaluation of current health status, analysis of certain medical treatments or medications,

and even potential immunization of donors." Defendant CSL Plasma Inc.'s Memorandum of Law in Support of Its Motion to Dismiss Plaintiffs' Class Action Complaint and to Strike Class Allegations, *Marsh v. CSL Plasma*, No. 1:19-CV-07606, 2020 WL 5088430 (Chang, J.) (filed June 22, 2020). Statement of Uncontested Facts (SUF) ¶ 6 (Ex. 3). What CSL Plasma admits here is indistinguishable from the "health care provider" category of service establishments covered under the ADA, 42 U.S.C. § 12181(7)(F).* For the reasons set forth below, this Court should hold that CSL Plasma is a public accommodation covered by the ADA Title III.

## FACTS

CSL Plasma operates facilities that are open to the public interested in plasma donation and that pay plasma donors to donate if they meet medical and other eligibility requirements. SUF ¶ 1 (CSL Answer ¶¶ 1–2, Answer, Ex. 1). Plaintiff Mark Gomez went to CSL Plasma in Montgomery, Illinois to donate plasma on July 28 and 30, 2018. SUF ¶ 2 (CSL Answer ¶¶ 15, 18). CSL Plasma did not allow him to donate. SUF ¶ 3 (CSL Answer ¶ 4, 20).

In a letter to Defendant dated November 19, 2018, Mr. Gomez's counsel Equip for Equality (EFE) stated that Mr. Gomez is deaf; he cannot lipread; he is not fluent in written English; he communicates in American Sign Language (ASL); Title III of the ADA requires places of public accommodation to provide auxiliary aids and services, including ASL interpreters, to ensure effective communication; and plasma donation centers are places of public accommodation under Title III. SUF ¶ 4 (CSL Answer ¶ 23; Letter, Ex. 2). In a letter dated December 21, 2018, CSL Plasma declined to provide any accommodation and it also denied that

---

* Judge Chang rejected CSL's position because he held that donors are not "patients" in a health care setting within the BIPA exemption. *Marsh v. CSL Plasma Inc.*, —— F. Supp. 3d ——, No. 19 C 6700, 2020 WL 7027720, at *4 (N.D. Ill. Nov. 30, 2020). It is not necessary to decide here, though, whether Gomez or other potential donors are deemed "patients" of CSL Plasma. It is enough, as set forth below, that donors enter the facilities to receive CSL Plasma's services.

it was a public accommodation under the ADA. SUF ¶ 5 (CSL Answer ¶ 24). It denies being a public accommodation in its Answer. *Id.* (CSL Answer ¶¶ 32–33 and Affirmative Defense 12).

## ARGUMENT

### I. Standard for Summary Judgment

The issue on this motion—whether a plasma bank is place of "public accommodation" under Title III of the ADA—is purely an issue of law applying ordinary standards of statutory construction, obviating any factual investigation or weighing of evidence. *See, e.g., Univ. of Chicago v. United States*, 547 F.3d 773, 776–77 (7th Cir. 2008) (summary judgment motion turns on meaning of the phrase "salary reduction agreement" under 26 U.S.C. § 3121(a)(5)(d)).

### II. Plasma Banks Fall Within the Plain Meaning of "Public Accommodation," and Specifically "Service Establishments"

The meaning of a statute begins, and often ends, with its plain language. *See Food Mktg. Inst. v. Argus Leader Media,* 139 S. Ct. 2356, 2364 (2019) (in "statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself" and where "that examination yields a clear answer, judges must stop"); *Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 336 (7th Cir. 2019) (relying on "plain meaning of the ADA's statutory text" and "ordinary import of the language Congress employed").

The plain meaning of public accommodation applies to plasma banks like defendant CSL Plasma. While the issue is one of first impression in this circuit, the Third and Tenth Circuits hold that plasma banks fall within the meaning of public accommodation. *Matheis v. CSL Plasma, Inc.*, 936 F.3d 171, 177–78 (3d Cir. 2019); *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1230–34 (10th Cir. 2016). The Fifth Circuit takes the minority view that plasma banks are not public accommodations, *Silguero v. CSL Plasma, Inc.*, 907 F.3d 323 (5th Cir. 2018), but as argued below, that decision is improperly reasoned and should not be followed.

With an aim to eradicate barriers to full participation in public life, Title III of the ADA proscribes discrimination against any individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). "The core meaning of this provision, plainly enough, is that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or *other facility … that is open to the public* cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (emphasis added). CSL Plasma's facility is open to members of the public who wish to donate plasma.

Congress further breaks out twelve descriptive categories of "public accommodations" under Title III of the ADA, which in relevant part includes:

> a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, *or other service establishment*.

42 U.S.C. § 12181(7)(F) (emphasis added). These twelve "extensive categories," according to the Supreme Court, "'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676–77 (2001) (citing S. Rep. No. 101–116, P. 59 (1989); H.R. Rep. No. 101–485, pt. 2, P. 100 (1990), U.S. Code Cong. & Admin. News 1990, pt. 2, at pp. 303, 382–383). The U.S. Department of Justice's ADA guidance underscores that "[w]hile the list of [twelve] categories is exhaustive, the representative examples of facilities within each category are not," and that "[w]ithin each category only a few examples are given." 28 C.F.R. Ch. 1, Pt. 36, App. C, at 893. Indeed, Congress considered and rejected more limited language that a covered entity be "similar" to those listed. H.R. Conf. Rep. No. 101-558, at 61 (1990).

CSL Plasma's admission in the *Marsh v. CSL Plasma* case that it is a "health care setting" (*see* pp.1-2) essentially concedes that it falls within a category of service establishment ("health care provider") expressly set out in the ADA definition. Along with that admission, the application of "service establishment" to CSL Plasma is straight-forward statutory interpretation.

*First*, a plasma bank is an "establishment" because it is a place of business. *Levorsen*, 828 F.3d at 1231. *See also Matheis,* 936 F.3d at 176–77 (same). Even in *Silguero*, 907 F.3d at 328, which CSL Plasma won, it was undisputed that a plasma bank is an "establishment."

*Second*, plasma banks offer a "service" to the public as part of a bargained-for exchange. Service is defined as "'conduct or performance that assists or benefits someone or something.'" *Levorsen*, 828 F.3d at 1231 (*quoting* WEBSTER'S THIRD NEW INT'L DICTIONARY 2075 (2002)). *Accord Matheis*, 936 F.3d at 176–77. Donors receive cash; plasma banks receive plasma that they sell for a profit. Plasma banks facilitate this transaction, one that a donor could not otherwise make, by offering services—blood screening and extraction—that require specialized equipment and technical expertise. *See Matheis*, 936 F.3d at 178 ("a plasma donation center … offers a service to the public, the extracting of plasma for money, with the plasma then used by the center in its business of supplying a vital product to healthcare providers"); *Levorsen*, 828 F.3d at 1234 (same). *See also Clancy v. Office of Foreign Assets Control of U.S. Dept. of Treasury*, 559 F.3d 595, 606 (7th Cir. 2009) ("service" means "an act of helpful activity; help; aid," *citing* Webster's College Dictionary (2d ed. 1997)). In ordinary usage, blood and plasma banks are understood to provide a "service." *See, e.g.*, *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1301 (7th Cir. 1995) (referring to blood banks, under state tort law, as a "provider of medical services"); *Advincula v. United Blood Services*, 678 N.E.2d 1009, 1015 (Ill. 1996) (Blood Shield Act "imposes a legal duty upon blood banks [to] … 'exercise[] due care and

followed professional standards of care in providing the service according to the current state of the medical arts'"); *Murphy v. E. R. Squibb & Sons, Inc.*, 710 P.2d 247, 252 (Cal. 1985) (under state's products liability law, "a blood bank supplying the blood" for a procedure is "providing a service rather than making a sale"). CSL Plasma, on its website, even refers to its donors as customers to who: "[w]ithin our collection centers, we often have a variety of part-time and full-time opportunities for individuals at an entry-level as well as those with experience to provide *excellent customer service* to plasma donors" https://www.cslplasma.com/careers/endless-careers-possibilities (last visited Mar. 31, 2021) (emphasis added) (SUF ¶ 6, Ex. 4, p.1). (Indeed, that CSL Plasma advertises on a website inviting the public to use its services is more support for it being a public accommodation. *See, e.g., Kalani v. Castle Village LLC*, 14 F. Supp. 3d 1359, 1373 (E.D. Cal. 2014) (activities at trailer-park clubhouse were advertised to the public)).

The Fifth Circuit would limit the word "service" to where "the establishment performed some action" that specifically "helped or benefited *the recipient*." *Silguero*, 907 F.3d at 328 (emphasis added). As the above authority shows, that interpretation is narrower that the ordinary usage. Even under this restrictive interpretation, though, plasma banks benefit the donor by paying them. For lower-income individuals, payment is a major part of the transaction. The idea that payment "is wholly collateral to the act of plasma collection" (*id.* at 329) is unwarranted.

The plain meaning of the "service establishment" is supported by "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). *Accord Parker Drilling Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019); *Nelson v. Great Lakes Educational Loan Services, Inc.*, 928 F.3d 639, 647 (7th Cir. 2019). The context is the ADA's intent to furnish "a clear and comprehensive national mandate for the elimination of discrimination" and ensuring that

"physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society." 42 U.S.C. §§ 12101(a)(1), 12101(b)(1). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182(a). Congress wrote an expansive definition of "public accommodation" to cover entities that affect commerce and are "open to the public." H.R. Rep. No. 101-485, pt. 2, at 35 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 317.

Additionally, the ADA promotes "economic self-sufficiency" for those with disabilities, 42 U.S.C. § 12101(a)(7), which would include their ability to earn money through plasma donation. The sad truth is that joblessness and poverty are endemic in the disabled community. Nat'l Council on Disability, *Highlighting Disability/Poverty Connection, NCD Urges Congress to Alter Federal Policies that Disadvantage People with Disabilities* (Oct. 26, 2017), https://ncd.gov/newsroom/2017/disability-poverty-connection-2017-progress-report-release (only 32% of working-age people with disabilities are employed, compared with 73% of those without disabilities, with more than 65% of the 17.9 million working-age adults with disabilities participating in at least one safety net or income support program). It is hardly a stretch to assume that people with disabilities will donate plasma to cover basic life expenses. As CSL Plasma advertises on its website to potential donors, "You could make up to $700 this month." https://www.cslplasma.com/become-a-donor (last visited Mar. 31, 2021) (SUF ¶ 6, Ex. 4, p.7).

Conversely, there is no textual support for the argument that Congress meant to exclude certain establishments from coverage based on the specific details of their exchange with the public. *See, e.g., Doe*, 179 F.3d at 559 (Congress meant that any establishment "open to the

public cannot exclude disabled persons") (internal citation omitted). The aim was to ensure that, for all manner of businesses, individuals with disabilities would be able to "us[e] the facility in the same way that the nondisabled do." *Id.* The Fifth Circuit's decision in *Silguero*, contrariwise, would shrink the zone of interests covered by Title III to "clients or customers" in the narrowest conceivable sense, even though the ADA by its very terms covers all "individual[s]" in their equal enjoyment of "goods, services, facilities, privileges, advantages, or accommodations" without limit. 42 U.S.C. § 12182(a). *See, e.g.*, *Carello v. Aurora Policeman Credit Union*, No. 17 C 9346, 2018 WL 3740545, at *2 (N.D. Ill. Aug. 7, 2018) ("the ADA applies to more people than just those who can be described as 'customers and clients'"). The proper inquiry is not whether someone seeks access to engage in an exchange, but whether the discrimination complained of concerns "goods, services, facilities, privileges, advantages, or accommodations."

The Supreme Court cautioned against imposing such narrow constructions on the scope of the ADA in *PGA Tour*. There, the PGA argued that a professional golfer had no Title III rights to accommodations at a golf tournament, because participants were not among the clients or customers that Title III protects. *PGA Tour*, 532 U.S. at 678. The Court disagreed, holding that a participant was as much a "client or customer" as a spectator. The tour was open to the public (if they met the entry requirements) and offered "privileges," 42 U.S.C. § 12182(b)(1)(A)(i), to spectators *and* participants alike, triggering Title III coverage. *PGA Tour*, 532 U.S. at 679. It made no difference that the tournament offered the two groups distinct kinds of privileges. It would be "inconsistent with the literal text of the statute as well as its expansive purpose to read Title III's coverage, even given [the league's] suggested limitation, any less broadly." *Id.* at 680.

Because the ADA's language and context favor designating a plasma bank as a "service establishment," the issue can be decided without resort to other tools of statutory construction.

### III. CSL Plasma's Likely Arguments to Limit the Meaning of "Service Establishment" Are Unavailing

CSL Plasma will argue that instead of the plain meaning of "service establishment," the Court should draw a spurious distinction based on who gets paid—a meaning unrooted in the language, context, and overall statutory scheme of the ADA. That CSL Plasma's business model calls for a donor to *receive* rather than *pay* money is immaterial to whether it is an *establishment* that provides *services*. For various reasons, such a limiting construction must be rejected.

To begin with, the only way that CSL Plasma gets to its preferred construction is by leaping immediately into the canons of *ejusdem generis* and *noscitur a sociis*, as the Fifth Circuit did in *Silguero*, 907 F.3d at 329–30. This puts the cart before the horse. Such canons apply only where a court finds a textual ambiguity, and "service establishment" is not ambiguous. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 474 (2010) (under canon of *noscitur a sociis*, an "ambiguous term may be 'given more precise content by the neighboring words with which it is associated'"); *Garcia v. United States*, 469 U.S. 70, 74–75 (1984) (*ejusdem generis* used only to resolve ambiguous language); *Our Country Home Enterprises, Inc. v. CIR*, 855 F.3d 773, 787 (7th Cir. 2017) (*noscitur a sociis* used to resolve ambiguity); *United States v. Johnson*, 655 F.3d 594, 604 (7th Cir. 2011) ("[b]ecause the statutory text is clear, we have no need of recourse to *ejusdem generis*"); *Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351, 354 (7th Cir. 2006) ("[s]ince the canon [of *ejusdem generis*] is intended only as an aid to ascertaining the intent of the drafters when uncertainty or ambiguity exists, it applies only when it is not possible to determine the meaning of the words unless one focuses on the context"). *Cf. Smith v. Paslode Corp.*, 7 F.3d 116, 118 (8th Cir. 1993) (declining to use surrounding language in state statute to construe "entity providing health care services" as applying to blood banks; *ejusdem generis*

"does not apply in this case because the general terms of section 516.105 are clear"). As seen in Section I, "service establishment" is free of ambiguity and we do not need to reach the canons.

Even if there were ambiguity here, there are several other reasons why the canons fail to support CSL Plasma. *First*, courts will not apply *ejusdem generis* where it would limit the definition of a general term that Congress otherwise intended to be interpreted broadly. *See*, *e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 163 (2012) (rejecting reading of FLSA that "would defeat Congress' intent to define 'sale' in a broad manner and render the general statutory language meaningless"); *United States v. Alpers*, 338 U.S. 680, 682 (1950) (*ejusdem generis* may not be employed to "obscure and defeat the intent and purpose of Congress" or "render general words meaningless"). Also, the canon of *noscitur a sociis* does not license a court to consider "only … the immediately surrounding words, to the exclusion of the rest of the statute." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 409 (2011). As seen in § I, Congress drafted a broad law with no textual support for limiting "service establishment."

The Fifth Circuit held that its definition is textually based because the relationship between a plasma bank and a donor "is more akin to employment" and thus would be covered by Title I of the ADA, not Title III. *Silguero*, 907 F.3d at 330–31. This is specious. Donating blood is nothing like going to work. Plasma banks lack the element of *control* over donors deemed central to an employment relationship. *See, e.g., Dittmann v. Quest Diagnostics, Inc.*, 756 F. App'x 616, 618 (7th Cir. 2019) (that company that performed health screening and controlled a $500 payment to plaintiff did not make the health screening company an employer) (*citing Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–23 (1992)). *See also Martin*, 532 U.S. at 678 (also rejecting argument that Title I applies because claim was allegedly "job-related").

*Second*, courts do not apply *ejusdem generis* where it is "not *apparent* what common attribute connects the specific items." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 225 (2008) (emphasis added). One *apparent* connection between the fourteen businesses listed in 42 U.S.C. § 12181(7)(F) is that they are open to the public, as distinguished from businesses that do not have regular interaction with the public. Such a distinction makes sense, because one would reasonably expect public-facing enterprises to be able to provide accommodations to customers. Thus, if anything, *ejusdem generis* would *support* the broad reading of "service establishment" because CSL Plasma admits the public to donate plasma, even if it does not accept all donors.

That CSL Plasma interacts with both the public *and* institutional clients would not change the answer. In a now-repealed section of the Fair Labor Standards Act, 29 U.S.C. § 213(a)(2), Congress exempted "retail and service establishments" that were principally in intrastate commerce. In *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190 (1966), the Supreme Court rejected a construction of that term that would have limited coverage to businesses that transact exclusively with the public. "What is important for this decision is that Congress also intended that the retail exemption extend in some measure beyond consumer goods and services to embrace certain products almost never purchased for family or noncommercial use." *Id.* at 203.

Another *apparent* connection linking the listed examples of a "service establishment" in Section 12181(7)(F) is that each offers services requiring the use of expertise, equipment, or both. A hospital houses specialized equipment and medical professionals; a barber has expertise in cutting hair and uses a variety of tools like scissors and razors for doing the job; a shoe repair service uses both trained cobblers and specialized equipment; and so on. Plasma banks share the same characteristics: they provide the specialized equipment needed to collect plasma (e.g., needles, tubing, apheresis machines) and trained medical personnel to assess donor eligibility

and run equipment. CSL Plasma draws and mechanically processes each donor's blood through plasmapheresis, separating the plasma (the fluid portion of the blood, 21 C.F.R. § 640.60) before returning the red blood cells to the donor. The process takes about 90 minutes to complete. https://www.cslplasma.com/become-a-donor/your-first-donation (last visited Mar. 31, 2021) (SUF ¶ 6, Ex. 4, p.16). This also supports including plasma banks as "service establishments."

By contrast, the "common attribute" that CSL Plasma would dredge out of the list of fourteen businesses—the direction of payment—is far from *apparent*. It is not rooted in any purpose espoused by the ADA, focusing us on a wholly artificial distinction. Whether a customer pays or gets paid has no bearing on whether a plasma bank, or any other business, offers the sort of "goods, services, facilities, privileges, advantages, or accommodations" to the public that are the hallmarks of a public accommodation. *See* 42 U.S.C. § 12182(b)(1)(A)(i). What defines an ADA "service establishment" is that a service is offered to the public, not the specific details of that transaction. *See Levorsen*, 828 F.3d at 1233. The only way that CSL Plasma gets there is penciling-in extra language into the ADA such as "direction of payment" and "beneficiaries."

The distinction that CSL Plasma would have the Court draw also fails to square with the examples enumerated in the ADA. A bank, one of the examples in Section 12181(7)(F), typically pays interest to people who open savings accounts. In addition, banks do not invariably charge a customer for common banking services like withdrawing or depositing money.

Drawing the line as CSL Plasma would prefer would, if anything, insensibly limit the reach of the ADA—especially concerning the sorts of businesses that low-income disabled persons might be expected to visit. For example, a plasma bank's business model resembles recycling centers, which accept discarded aluminum cans from the public for cash. *Matheis,* 936 F.3d at 178 (citing *Estrada v. South Street Property, LLC*, No. 2:17-CV-259-CAS, 2017 WL

3461290, at *3 (C.D. Cal. Aug. 11, 2017)). Both types of businesses invite members of the public to exchange their otherwise commercially valueless raw material for cash, then sell that raw material, or products created from it, to other companies for profit. Like plasma banks, recycling centers pay cash and "operate in reverse to the examples listed in § 12181(7)(F)." *Estrada* correctly found that recycling centers are "service establishments" and are not free to exclude people with disabilities just because the money flows in the "wrong" direction. CSL Plasma's definition would also cast a shadow over pawn shops, which make small-dollar loans using clients' personal property as security. *Levorsen*, 828 F.3d at 1234 n.8 (citing pawn shops).

*Third*, even if we are to consider the list of businesses to construe the scope of "service establishment," this exercise would (if anything) support *plaintiff's* interpretation. The services that plasma banks provide to their customers—activities that require medical and scientific expertise—are comparable to services offered by some "health care provider[s]," entities that are specifically named in § 12181(7)(F). (As noted above, CSL Plasma itself made this argument in the *Marsh* case.) CSL Plasma employs medical professionals to supervise or conduct examinations and blood extractions. CSL Plasma screens donors and tests and processes their blood in a manner consistent with activities that take place at a doctor's office. Likewise, plasma banks are like "banks," an "obvious example of a service establishment that uses the fruits of its public-facing services for subsequent profit. Not only does it provide the means and expertise to hold safely the public's money, it also may provide interest or other benefits (including cash or rewards) to convince customers to entrust them with their savings." *Matheis*, 936 F.3d at 177.

Finally, if there remained any ambiguity, the U.S. Department of Justice—with authority to enforce and promulgate regulations under Title III (42 U.S.C. § 12186(b), 12188(b); 28 C.F.R. Pt. 36)—has filed amicus briefs supporting the application of Title III to plasma banks. *See* Brief

for the United States as Amicus Curiae Supporting Appellant and Urging Reversal, *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016), 2015 WL 2151483; Brief for the United States as Amicus Curiae Supporting Neither Party," *Silguero v. CSL Plasma, Inc.*, 907 F.3d 323 (5th Cir. 2018), 2018 WL 889624. The DOJ's considered and consistent interpretation deserves at least respectful attention, if not outright judicial deference. *See, e.g., Woodman's Food Market, Inc. v. Clorox Co.*, 833 F.3d 743, 749 (7th Cir. 2016) (*citing Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and *United States v. Mead Corp.*, 533 U.S. 218 (2001)).

## CONCLUSION

For the above-stated reasons, this Court should hold that CSL Plasma is a "public accommodation" for the purposes of coverage under the ADA.

Dated: April 19, 2021

MARK GOMEZ,

By:    /s/ Paul W. Mollica
       One of His Attorneys

Steven P. Blonder (sblonder@muchlaw.com)
Jonathan L. Loew (jloew@muchlaw.com)
MUCH SHELIST, P.C.
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606-2000
Ph. (312) 521-2000

Barry C. Taylor (barryt@equipforequality.org)
Paul W. Mollica (paulm@equipforequality.org)
EQUIP FOR EQUALITY
20 North Michigan Avenue
Suite 300
Chicago, Illinois 60602
Ph. (312) 341-0022

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

Plaintiff, by undersigned counsel, filed and served his Memorandum of Law in Support of Motion for Partial Summary judgment upon the persons listed below by filing through the Court's ECF system on April 19, 2021:

>Eric A. Berg (eric.berg@ogletree.com)
>OGLETREE, DEAKINS, NASH, SMOAK
>   & STEWART P.C.
>155 North Wacker Drive, Suite 4300
>Chicago, Illinois 60606
>Ph. (312) 558-1424

>___/s/ Paul W. Mollica_____
>One of the attorneys for plaintiff